**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         jsmith@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LILAS ABUELHAWA, KELLY WYNNE, and LEONARDO KIM, individually and on behalf of all others similarly situated,<br><br>                                   Plaintiffs,<br><br>        v.<br><br>SANTA CLARA UNIVERSITY,<br><br>                                   Defendant. | Case No. 5:20-cv-04045-LHK<br><br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMLAINT** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs respectfully request that the Court take judicial notice of the documents and matters set forth below (together with their contents) pursuant to Federal Rule of Evidence 201.  Rule 201 permits courts to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED.R.CIV.PROC. 201(b)(2).  Under Rule 201, a court may take judicial notice of court records. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("a court may take judicial notice of 'matters of public record'");*Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 n. 3 (9th Cir. 2005) (taking judicial notice of a docket of another court).  Accordingly, Plaintiffs respectfully ask that the Court take judicial notice of the following documents, which are attached as Exhibits 1-3 of this Request for Judicial Notice ("RJN")

1. Exhibit 1:  *Verlanga v. Univ. of San Francisco*, S.F. Superior Ct. Case No. CGC-20-584829, Nov. 12, 2020 Order on Demurrer.

2. Exhibit 2:   *Garland v. Western Michigan Univ.*, State of Michigan Court of Claims, Case No. 20-000063-MK, Sept. 15, 2020 Order on Motion for Summary Disposition.

3. Exhibit 3:  *Milanov v. Univ. of Michigan*, State of Michigan Court of Claims, Case No. 20-000056-MK, July 27, 2020 Order on Motion for Summary Disposition.

4. Exhibit 4:  *Chong v. Northeastern Univ.*, D. Ma. Case No. 1:20-cv-10844, Dec. 14, 2020 Order on Motion to Dismiss.

Dated:  December 14, 2020

**BURSOR & FISHER, P.A**.

By:   */s/ Joel D. Smith*
　　　　Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
　　　　jsmith@bursor.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

*Attorneys for Plaintiffs*

**EXHIBIT 1**

Prepared by Court.

**F I L E D**

San Francisco County Superior Court

NOV 1 2 2020

CLERK OF THE COURT

BY: _____
                    Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

SAMANTHA VERLANGA, JASMINE
MOORE and AMBER KAISER, individually
and as representatives of their class,

    Plaintiffs,

vs.

UNIVERSITY OF SAN FRANCISCO,

    Defendant.

Case No.  CGC-20-584829

**ORDER ON DEFENDANT
UNIVERSITY OF SAN FRANCISCO'S
DEMURRER TO COMPLAINT**

    Defendant University of San Francisco's demurrer to the complaint came on regularly for hearing before the Hon. Ethan P. Schulman, on November 12, 2020 at 9:30 a.m. in Department 302.  Both parties appeared via videoconference by their counsel of record.

    The Court, having considered the papers and pleadings filed in connection with the motion, and the arguments of counsel presented at the hearing, and good cause appearing therefor, hereby rules as follows:

-1-

ORDER ON DEFENDANT UNIVERSITY OF SAN FRANCISCO'S DEMURRER TO COMPLAINT
Case No. CGC-20-584829

1    Defendant University of San Francisco's demurrer to the complaint is overruled as to the

2    first cause of action for breach of contract, sustained with leave to amend as to the second cause

3    of action for violation of the Unfair Competition Law and without leave to amend as to the third

4    cause of action for conversion, and sustained with leave to amend as to the fourth cause of action

5    for quasi-contract and the fifth cause of action for promissory estoppel.

6

7                                     **FACTUAL ALLEGATIONS**

8            This is a putative class action on behalf of all California citizens who paid tuition and

9    other fees for the Spring 2020 academic semester at USF and who, because of USF's response to

10   the global COVID-19 pandemic, did not receive the full benefit of the educational services,

11   facilities, and other services for which they allegedly contracted and paid.  Plaintiffs Samantha

12   Berlanga and Jasmine Moore, both undergraduates at USF, allege they were each charged

13   approximately $26,000 in tuition and fees to attend USF in person for the Spring 2020 semester,

14   which began on January 21, 2020 and ended with final exams around May 14, 2020.  Plaintiffs

15   allege that effective March 11, 2020, USF suspended all classes and closed its campus because

16   of the pandemic; that students were notified that they needed to vacate their residence halls no

17   later than March 21, 2020; and that USF has not held any in-person classes since March 11,

18   2020, but instead has moved all educational instruction online (so-called "distance learning").

19   Plaintiffs allege that the online learning options offered to USF students are "subpar" and

20   "deprive students of the full university learning experience, because of the lack of facilities,

21   materials, and access to faculty"; and that online learning has deprived them of "the opportunity

22   for collaborative learning and in-person dialogue, feedback and critique" and of "the full

23   academic and social university experience" for which they paid.  Plaintiffs allege further that

24   USF has announced that it will not refund any tuition or fees for the Spring 2020 semester.  They

25   seek a refund of tuition for in-person educational services, facilities, access and/or opportunities

26   that USF has not provided, and a refund of other fees for services that USF is not providing.

27

ORDER ON DEFENDANT UNIVERSITY OF SAN FRANCISCO'S DEMURRER TO COMPLAINT
Case No. CGC-20-584829

1

**DISCUSSION**

2      While USF admittedly did not meet and confer with Plaintiffs before filing its demurrer

3  as required by Code of Civil Procedure section 430.41, the Court does not believe there is any

4  realistic prospect that an agreement could have been reached that would have resolved the

5  objections raised in the demurrer, and accordingly will decide the demurrer on its merits.

6      At the outset, the Court declines to consider the declaration of Dr. Tyrone Heath Cannon.

7  It is elementary that a demurrer can be used only to challenge defects that appear on the face of

8  the complaint, or from matters outside the pleading that are judicially noticeable.  (*Blank v.*

9  *Kirwan* (1985) 39 Cal.3d 311, 318; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th

10  968, 994.)  "No other extrinsic evidence can be considered."  (*Kerivan v. Title Ins. & Trust Co.*

11  (1983) 147 Cal.App.3d 225, 229.)  The Court likewise denies USF's request for judicial notice of

12  its catalog, including the refund policy and the university's reservation of rights to modify its

13  regulations and programs.  "Although the *existence* of a document may be judicially noticeable,

14  the truth of statements contained in the document and its proper interpretation are not subject to

15  judicial notice if those matters are reasonably disputable."  (*Fremont Indemnity Co. v. Fremont*

16  *General Corp.* (2007) 148 Cal.App.4th 97, 113 [error to take judicial notice of parties' letter

17  agreement on demurrer] (emphasis in original); see also *Joslin v. H.A.S. Ins. Brokerage* (1986)

18  184 Cal.App.3d 369, 374 [demurrer may not be turned into contested evidentiary hearing].)

19  Plaintiffs do not refer to USF's catalogs or published policies in their complaint, nor do they

20  allege that any statements in those materials form a basis for their claims.  (Compare *Kashmiri v.*

21  *Regents of University of California* (2007) 156 Cal.App.4th 809, 828 ["[plaintiffs] contend that

22  the University breached its express promise on its websites and its catalogues not to increase the

23  [professional degree fee] for continuing students."].)  They therefore are not properly considered

24  by the Court on demurrer.

25      USF's demurrer to the claims asserted by Plaintiff Amber Kaiser, the parent of Plaintiff

26  Jasmine Moore, on the ground that she lacks standing to assert claims on behalf of an adult

27

1   student is overruled.  Plaintiffs do not allege that Ms. Moore was an adult when her Spring 2020

2   fees were paid and, as noted, the Court cannot consider extrinsic evidence on demurrer to

3   determine that issue.

4          The Court overrules USF's demurrer to the first cause of action for breach of contract.

5   "[T]he basic legal relationship between a student and a private university is contractual."

6   (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 823-824; see also

7   *Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 10.) "By the act of

8   matriculation, together with payment of required fees, a contract between the student and the

9   institution is created." (*Id.* at 824.)  Absent a formal agreement between the student and the

10  university, the agreement is an implied-in-fact contract.  "The terms of an express contract 'are

11  stated in words,' while the terms and the existence of an implied contract 'are manifested by

12  conduct.'" (*Id.* at 827.)  Statements in university catalogues, student manuals, and registration

13  materials may become part of the implied-in-fact contract.  (*Id.* at 828-829.)  Significantly at this

14  stage of the proceedings, "the question whether the parties' conduct creates such an implied

15  agreement is generally a question of fact." (*Id.* at 829.)

16         Plaintiffs have adequately pled each of the basic elements of a claim for breach of

17  contract: (1) the existence of the contract, (2) plaintiff's performance or excuse for

18  nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.  (*Oasis

19  West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  Thus, Plaintiffs allege that through

20  the admission agreement and payment of tuition and fees, they entered into a binding contract

21  with USF.  (Compl. ¶ 44.)  Specifically, they allege that tuition for Spring semester 2020 was

22  "intended to cover in-person educational services from January through May 2020." (*Id.* ¶ 45.)

23  Finally, they allege that they have suffered damage as a direct and proximate result of USF's

24  contractual breaches, including being deprived of "the in-person education, experience, and

25  services . . . which they were promised and for which they have already paid." (*Id.* ¶ 51.)  While

26  it is true, as USF argues, that Plaintiffs do not identify any express or specific promise that was

27

-4-

1  breached, they allege that tuition and fees at USF are paid in exchange for, among other things,

2  in-person coursework; face-to-face interaction and collaboration with professors, advisors, and

3  peers; access to facilities such as libraries, laboratories, computer labs, and study rooms; access

4  to technology, graphic design computer programs, and equipment; visits and tours of advertising

5  agencies, including in-person presentations and interviews; student governance and student

6  unions; extra-curricular activities, groups, intramural sports, and related activities; student art,

7  cultures, church access, and other activities; social development, fraternal organizations, and

8  independence; hands-on learning and experimentation; and networking and mentorship

9  opportunities.  (Compl. ¶ 33.)

10      Construing the complaint liberally, as required (Code Civ. Proc. § 452), these allegations

11  are sufficient to state a claim for breach of an implied-in-fact contract.  As one federal court

12  recently concluded in a closely analogous case,

13      Throughout the amended complaint, [plaintiff] alleges that the College's publications
    clearly implied that courses would be conducted in-person.  The College's materials also
14      touted its many resources and facilities—of which were located on the campus thereby
    implying in-person participation.  These allegations are sufficient at this early stage,
15      especially because Florida law recognizes that the college/student contract is typically
    implied in the College's publications.
16

17  (*Salerno v. Florida Southern College* (M.D. Fla. Sept. 16, 2020) --- F.Supp.3d ----, 2020 WL

18  5583522, at *5;[1] see also *Zumbrun*, 25 Cal.App.3d at 10-11 [allegations that USC contracted to

19  give course consisting of a given number of lectures and a final examination in exchange for

20  tuition and fees paid by plaintiff, and that professor refused to give all promised lectures and to

21  conduct a final exam because of faculty strike protesting United States foreign policy in

22

23  _____
    [1] Other courts have begun to hand down rulings on initial motions to dismiss actions brought
24  against public and private universities by students seeking tuition and fee refunds as a result of
    the COVID-19 pandemic. Those courts largely have denied those motions based on reasoning
25  similar to that set forth here. (See, e.g., *Rosado v. Barry University Inc.* (S.D. Fla. Oct. 30, 2020)
    --- F.Supp.3d ----, 2020 WL 6438684; *Chong v. Northeastern University* (D. Mass. Oct. 1, 2020)
26  --- F.Supp.3d ----, 2020 WL 5847626; *Waitt v. Kent State University* (Oh. Ct. Cl. Sept. 28, 2020)
    2020 WL 5894543; *McDermott v. The Ohio State University* (Oh. Ct. Cl. Aug 24, 2020); *Cross
27  v. University of Toledo* (Oh. Ct. Cl. July 8, 2020) 2020 WL 4726814.)

ORDER ON DEFENDANT UNIVERSITY OF SAN FRANCISCO'S DEMURRER TO COMPLAINT
Case No. CGC-20-584829

1    Cambodia, stated claim for breach of contract].) USF's arguments regarding damages and

2    proximate cause raise factual issues that cannot be resolved on demurrer.  (See *Zumbrun*, 25

3    Cal.App.3d at 11 [whether alleged breach "justifies refund of a portion of the tuition and fee

4    allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an

5    appropriate forum"].)

6          In *Kashmiri*, the Court of Appeal affirmed summary judgment for plaintiff students in a

7    class action against the University of California seeking injunctive and declaratory relief and

8    damages after the university increased various fees.  The court concluded that implied contracts

9    were formed between the university and students, and that the university breached its contracts in

10   two respects: by raising the professional educational fees for continuing students after promising

11   on its website and in its catalogues that such fees would not be raised for the duration of the

12   students' enrollment in the professional program; and by raising the educational fees for the

13   spring and summer sessions in 2013 after the students had received bills specifying the exact

14   amount to be paid.  That case is closely instructive here.

15         Plaintiffs' allegations here are most comparable to the second claim in *Kashmiri*, that the

16   university billed students for the spring and summer terms, but then increased the fees after the

17   students had received their bills.  (*Id.* at 841-848.)  The court determined that "it was reasonable

18   for the student to expect that once he or she received an actual bill for a specific amount to be

19   paid by a particular date, and that bill did not indicate there could be any further change, the

20   University had established the actual fee as reflected by the bill."  (*Id.* at 844.)  The university's

21   general disclaimer on its website that it retained the right to increase the fees without providing

22   any notice could not overcome the reasonable expectations of the parties at the time the contract

23   was formed.  (*Id.* at 842-843.)  "[O]nce the student is told that he or she can enroll at a particular

24   price and must pay that particular sum by a certain date, the student should reasonably be able to

25   expect that fee has now become firm."  (*Id.* at 848.)  Thus, the University breached its contracts

26

27

ORDER ON DEFENDANT UNIVERSITY OF SAN FRANCISCO'S DEMURRER TO COMPLAINT
Case No. CGC-20-584829

1  with the students attending the two terms when it raised the educational fees for these terms after

2  the students had received bills charging them a set fee to be paid by a particular date. (*Id.*)

3      Here, likewise, USF billed students such as Plaintiffs for tuition and fees for the Spring

4  semester, and Plaintiffs allege they paid those amounts.  It was reasonable for Plaintiffs to expect

5  when they were billed for the Spring semester that they would receive the services, including in-

6  person instruction and lodging in university residence halls, that were allegedly promised to

7  them.  When USF changed the nature of the educational and other services students reasonably

8  expected to receive in exchange for their payments, it arguably breached its contracts with

9  Plaintiffs and other students.

10      USF contends that although Plaintiffs have framed their claims as contractual in nature,

11  they are actually attempting to challenge academic decisions regarding USF's "mode of

12  instruction" (i.e., shifting from in-person to online), which amounts to a forbidden claim of

13  "educational malpractice." (Dem. at 4-7.) The Court disagrees.  As the *Kashmiri* court

14  acknowledged, "it is well settled that contract law is not always rigidly applied, especially in

15  actions challenging the academic decision of a university or a student's qualifications for a

16  degree." (*Id.* at 825.)  "Courts have applied contract law flexibly to actions involving academic

17  and disciplinary decisions by educational institutions because of the lack of a satisfactory

18  standard of care by which to evaluate these decisions." (*Id.* at 826; see also *id.* at 835 ["Courts

19  have consistently refused to interfere with the educational curriculum and selection, retention,

20  and conditions of employment of academic personnel, which is not at issue in the case before

21  us."].)  "Courts have, however, not been hesitant to apply contract law when the educational

22  institution makes a specific promise to provide an educational service, such as a failure to offer

23  any classes or a failure to deliver a promised number of hours of instruction." (*Id.*)  This action,

24  like *Kashmiri*, "does not involve what is essentially an educational malpractice claim or a

25  decision that involves disciplinary discretion. . . . 'Ruling on this [fee dispute] would not require

26  an inquiry into the nuances of educational processes and theories, but rather than objective

27

1    assessment of the University's performance of its promise." (*Id.* at 826-827.) Just as in *Salerno*,

2    "this case is not about the quality of the [University's] education" or its decision to move to

3    online learning; "This case is simply about an alleged promise to provide in-person learning that

4    was allegedly breached." (2020 WL 5583522, at *5.)

5         USF also contends that its decision to suspend in-person instruction was "a reasonable

6    response to emergency conditions and required by government orders" concerning the pandemic.

7    (Dem. at 6:7-17.) That may well be, but it is not dispositive of Plaintiffs's claims at the pleading

8    stage. "[E]conomic crises do not excuse performance on a contract. 'Facts which may make

9    performance more difficult or costly than contemplated when the agreement was executed do not

10   constitute impossibility.'" (*Kashmiri*, 156 Cal.App.4th at 839 [rejecting argument by University

11   of California that state fiscal crisis constituted an emergency that excused its performance of a

12   contractual promise not to raise certain student fees].)

13        Because the first cause of action states a claim for breach of contract, the Court need not

14   address USF's additional argument regarding the included claim for breach of the implied

15   covenant of good faith and fair dealing. A general demurrer may not be sustained as to a portion

16   of a cause of action. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150,

17   1167; see also *Franklin v. The Monadnock Co.* (2007) 151 Cal.App.4th 252, 257 ["It is error for

18   a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any

19   possible legal theory."].)

20        The Court sustains USF's demurrer to the second cause of action for violation of the

21   Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*, with leave to amend. Plaintiffs

22   apparently seek to predicate the UCL claim on a purported violation of the Consumer Legal

23   Remedies Act (Compl. ¶ 58(a)), but do not actually allege any claim for violation of the CLRA

24   or the factual basis for such a claim. Nor do Plaintiffs allege sufficient facts to state a claim

25   under the UCL's "unfair" or "fraud" prongs. Plaintiffs do not allege that members of the public

26   are likely to be deceived by the challenged conduct. (*Schnall v. Hertz Corp.* (2000) 78

27

-8-

Cal.App.4th 1144, 1167.)  Nor do they allege (nor, presumably, could they) that USF's statements were fraudulent *when made*—i.e., before the pandemic.  Finally, although Plaintiffs seek injunctive relief, they do not allege that USF is engaged in any *ongoing* conduct that could properly be enjoined.  An injunction under the UCL "is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff." (*Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 315-316.)  Plaintiffs have leave to amend to clarify the factual basis for their UCL claim under one or more of the statutory prongs.

The Court sustains USF's demurrer to the third cause of action for conversion without leave to amend.  "Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240.)  "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.  A generalized claim for money [is] not actionable as conversion." (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395.) "[A]ctions for the conversion of money have not been permitted where the amount of money involved is not a definite sum." (*Id.*)

Here, Plaintiffs are not seeking to recover all of the tuition and fees they paid to USF, but rather only an unspecified "prorated portion" of that tuition and fees.  (Compl. ¶¶ 39(e) ["that portion of the tuition and fees attributable to the services that USF did not provide"], 70, 73.)  Moreover, that prorated amount presumably is different for each Plaintiff (and every member of the putative class), depending on the tuition and fees each paid, whether such amounts were covered in whole or in part by grants or other forms of financial aid, whether they had lodging in USF residence halls and, if so, when they moved out, and the extent to which their individual undergraduate or graduate programs involved areas of concentration where in-person instruction

1   and access to technology is or is not crucial.  (See Compl. ¶¶ 13, 14, 27.)  Plaintiffs' counsel

2   conceded at the hearing that the specific amount that was allegedly converted is "unknown."

3   Thus, the complaint does not state a claim for conversion.  (See *PCO, Inc.*, 150 Cal.App.4th at

4   395 [affirming summary judgment on conversion claim where "plaintiffs could only estimate the

5   amount of cash" allegedly converted]; see also *Salerno*, 2020 WL 5583522, at *5 [dismissing

6   conversion claim with prejudice where "an obligation to pay money, like [plaintiff's] claim for

7   tuition reimbursement, is also insufficiently tangible to qualify as 'property' under these facts"]

8   [applying Florida law].)  Plaintiffs have not shown a reasonable likelihood that they could amend

9   to overcome this defect.

10      USF's demurrers to Plaintiffs' claims in the fourth cause of action for quasi-contract and

11  in the fifth cause of action for promissory estoppel are sustained with leave to amend.  " '[A]n

12  action based on an implied-in-fact or quasi-contract cannot lie where there exists between the

13  parties a valid express contract covering the same subject matter." (*Rutherford Holdings, LLC v.

14  Plaza Del Rey* (2014) 223 Cal.App.4th 221, 231-232.)  "Although a plaintiff may plead

15  inconsistent claims that allege both the existence of an enforceable agreement and the absence of

16  an enforceable agreement, that is not what occurred here.  Instead, plaintiffs' breach of contact

17  claim pleaded the existence of an enforceable agreement and their unjust enrichment claim did

18  not deny the existence or enforceability of that agreement.  Plaintiffs are therefore precluded

19  from asserting a quasi-contract under the theory of unjust enrichment." (*Klein v. Chevron USA,

20  Inc.* (2012) 202 Cal.App.4th 1342, 1389-1390.)  The same is true here.  (See Compl. ¶ 44

21  [alleging Plaintiffs "entered a binding contract with USF"].)  Plaintiffs have leave to amend to

22  allege facts supporting an alternative theory of recovery.

23      Likewise, promissory estoppel is an equitable doctrine that allows enforcement of a

24  promise that would otherwise be unenforceable because of lack of consideration.  (*US Ecology,

25  Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901-902.)  "The elements of a promissory

26  estoppel claim are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to

27

1   whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4)

2   the party asserting the estoppel must be injured by his reliance.'" (*Id.* at 901.)  Promissory

3   estoppel is not available here because Plaintiffs allege that the underlying contract was entered

4   into for consideration.  (Compl. ¶ 45.)  Again, however, Plaintiffs have leave to amend to plead

5   such an alternative theory.

6         Finally, USF's demurrer to Plaintiffs' prayer for punitive damages and injunctive relief is

7   unavailing.  "[A] demurrer cannot rightfully be sustained to part of a cause of action or to a

8   particular type of damage or remedy." (*Kong v. City of Hawaiian Gardens Redevelopment*

9   *Agency* (2002) 108 Cal.App.4th 1028, 1047; *Venice Town Council, Inc. v. City of Los Angeles*

10  (1996) 47 Cal.App.4th 1547, 1562 ["a demurrer tests the sufficiency of the factual allegations of

11  the complaint rather than the relief suggested in the prayer of the complaint"]; *Grieves v.*

12  *Superior Court* (1984) 157 Cal.App.3d 159, 163 [punitive damage allegations were not subject to

13  demurrer].)

14

15  **CONCLUSION**

16        In the Spring of this year, USF, like countless other educational institutions in the United

17  States and around the world, was confronted with an unprecedented public health crisis that

18  dramatically affected its ability to continue holding classes and providing education as it had in

19  the past.  Nothing in this order is intended to suggest that USF did anything improper in acting as

20  it did to shift from in-person to online instruction.  The Court merely finds that Plaintiffs have

21  pled certain viable causes of action.  Whether Plaintiffs can prevail on those causes of action and,

22  if so, the amount of tuition and fees which they may be entitled to recover, if any, present factual

23  issues that will have to await decision on a complete record at a later stage of the litigation.

24  (*Kerivan*, 147 Cal.App.3d at 229 ["plaintiff's possible inability or difficulty in proving the

25  allegations of the complaint is of no concern."]; see *Salerno*, 2020 WL 5583522, at *1

26  ["[Plaintiff], a student, has alleged the elements of a breach of contract claim against Florida

27

1    Southern College in her amended complaint.  At this early stage in the case, that is all that is

2    necessary.  The more difficult issues will come later, at the summary judgment stage."].)

3          Plaintiffs have 20 days leave to amend.

4          **IT IS SO ORDERED.**

5    Dated:  November 12, 2020

6

7                                                     HON. ETHAN P. SCHULMAN

8

9                                        JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CGC-20-584829   SAMANTHA BERLANGA, JASMINE MOORE AND AMBER KAISER
VS. UNIVERSITY OF SAN FRANCISCO

I, the undersigned, certify that I am an employee of the Superior Court of California, County Of San Francisco and not a party to the above-entitled cause and that on November 12, 2020 I served the foregoing ORDER ON DEFENDANT UNIVERSITY OF SAN FRANCISCO'S DEMURER TO COMPLAINT  on each counsel of record or party appearing in propria persona by causing a copy thereof to be enclosed in a postage paid sealed envelope and deposited in the United States Postal Service mail box located at 400 McAllister Street, San Francisco CA  94102-4514 pursuant to standard court practice.

STEPHEN M. FISHBACK  (191646)
KELLER, FISHBACK & JACKSON LLP
28720 CANWOOD STREET
AGOURA HILLS, CA  91301-4521

VITO A. COSTANZO  (132754)
HOILLAND & KNIGHT LLP
400 SOUTH HOPE STREET
8TH FLOOE
LOS ANGELES, CA  90071

**EXHIBIT 2**

# STATE OF MICHIGAN

# COURT OF CLAIMS

| | |
|---|---|
| KAI GARLAND, and all others who are similarly situated | **<u>OPINION AND ORDER</u>** |
| Plaintiffs, | |
| v | Case No.  20-000063-MK |
| WESTERN MICHIGAN UNIVERSITY, and THE BOARD OF TRUSTEES OF WESTERN MICHIGAN UNIVERSITY, | Hon. Cynthia Diane Stephens |
| Defendants. | |

Pending before the Court in this putative class action is defendants' motion for summary disposition filed pursuant to MCR 2.116(C)(8).  For the reasons that follow, the motion is DENIED.

## I.        BACKGROUND

Plaintiff is a student at defendant Western Michigan University (WMU).  This case arises out of plaintiff's demand for a refund of pre-paid tuition, room and board, and fees after plaintiff left WMU's campus following the university's transition to online learning during the onset of the COVID-19 pandemic in March 2020.  The university offered distance learning for the remainder of the Spring 2020 semester, starting in mid-March.  It also urged students to move out of on-campus housing.  Plaintiff agrees in her complaint that she accepted, the university's offer of a $1,000 refund for moving out of on-campus housing but asserts that amount was inadequate to

compensate for both the accommodations and meal and educational services and fees for which she paid but the value of which she did not receive.

Plaintiff's complaint alleges that WMU retained the value of payments made by plaintiff and other purported class members for tuition, room and board, and fees, while failing to provide the services that were promised to students.  Plaintiff purports to bring the action on behalf of three classes of claimants: (1) the "tuition" class, i.e., those students who paid tuition and expected live, in-person instruction; (2) the "room and board" class, i.e., those students who moved out of university housing and who did not receive a refund for prepaid amounts; and (3) the "fee" class, i.e., those students who paid fees for the Spring 2020 semester but who did not receive the expected services associated with those fees.

Count I of the complaint alleges breach of contract with respect to tuition paid by plaintiff. According to plaintiff, she entered into a contractual agreement—which agreement is in the possession of WMU—with WMU pursuant to which the university agreed to provide live, in-person instruction in exchange for the payment of tuition.  WMU purportedly breached this agreement, however, by moving the second half of all Spring 2020 classes to online, distance learning platforms and by refusing to refund tuition amounts prepaid by plaintiff and other class members.  Plaintiff alleges that she has been damaged because she was deprived of the value of live, in-person instruction in a classroom setting.

Count II alleges breach of contract with respect to room and board.  Plaintiff alleges that this count arises out of a contract that is in WMU's possession.  Pursuant to this agreement, she prepaid an amount for room and board, and WMU was to provide on-campus housing and meals.

WMU allegedly breached this agreement, however, by not providing housing and meals for the entire semester.

Count III alleges breach of contract with respect to certain fees paid during the Spring 2020 semester. Once again, plaintiff alleges that the pertinent contracts are in WMU's possession. In short, plaintiff alleges that WMU charged certain fees, but failed to provide the agreed-upon services related to the various fees. Plaintiff alleges that she was damaged because she was deprived of the value of the services the fees were intended to cover, and that WMU has refused to provide a refund.

Counts IV-VI, which are alleged in the alternative, assert claims of unjust enrichment with respect to tuition, room and board, and fees. Plaintiff alleges that defendants retained prepaid amounts for tuition, room and board, and fees to which they were not entitled, given that the services intended to be covered by the funds were never provided. Plaintiff contends that equity demands defendants return the portion of funds to which they were not entitled.

This matter is before the Court on defendants' motion for summary disposition filed pursuant to MCR 2.116(C)(8). Defendants first argue that this Court should refrain from entertaining plaintiff's claims and insist that the Court should not interfere with the autonomy of the university to control and manage its affairs. Second, defendants argue that enrollment in the university does not create contractual rights and obligations as a matter of law. Defendants assert that they did not breach any agreements that might have existed. Finally, defendants argue that plaintiff's unjust enrichment claims fail as a matter of law because plaintiff failed to allege that WMU retained any monies for an improper purpose.

## II.   ANALYSIS

Defendants move this Court for summary disposition under MCR 2.116(C)(8).  "A motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim based on the factual allegations in the complaint."  *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019) (emphasis omitted).  "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone."  *Id*. at 160.  Summary disposition is appropriate under subrule (C)(8) only if the plaintiff's claim "is so clearly unenforceable that no factual development could possibly justify recovery."  *Id*.

### A.  UNIVERSITY AUTONOMY

The Court first turns to defendants' argument that it should refrain from interfering with university autonomy and that it should decline to question the manner in which WMU conducts its affairs.  In support, defendants cite Const 1963, art 8, § 6, and *Sprik v Regents of Univ of Mich*, 43 Mich App 178; 204 NW2d 62 (1972), aff'd on other grounds 390 Mich 84; 210 NW2d 332 (1973).  In *Sprik*, 43 Mich App at 182, the University of Michigan, pursuant to leases with certain students, increased rent for students living in certain university-owned housing.  The University used the rent increase to make a payment to the Ann Arbor School District.  *Id*.  The plaintiffs in that case objected to the money being paid to the school district.  *Id*. at 183.  After accepting the plaintiffs' concession that their leases with the University of Michigan allowed the increase, the Court of Appeals held that the University Regents had constitutional authority to control and manage university affairs, including the expenditure of the funds at issue.  *Id*. at 186.

The Court does not agree with defendants' contention in the instant case that the holding in *Sprik* precludes the relief requested by plaintiff.  Nor does the Court agree that the holding in *Sprik* precludes it from considering whether the refund issued to plaintiff for room and board

-4-

adequately compensated plaintiff for any damages to which she may or may not be entitled.  As

the parties' briefing acknowledges, the pleadings and arguments in this case are strikingly similar

to those in other cases filed against other public universities in the Court of Claims.  The Court

finds instructive and persuasive the reasoning employed in *Milanov v Univ of Mich*, opinion and

order of the Court of Claims, issued July 27, 2020 (Docket No. 20-000056-MK), p. 8:

> The case at bar is distinguishable from *Sprik* because plaintiffs are not challenging
> an expenditure made by defendants.  Instead, they are arguing that defendants
> breached contractual agreements and/or unjustly retained a benefit by failing to
> provide plaintiffs the full benefit of their bargain.  Defendants have failed to present
> a compelling argument as to why [the Michigan Constitution's] provisions about
> defendant regents' control over university expenditures would insulate them from
> claims sounding in contract or quasi-contract.

This case is not about WMU's budget allocations , instead it concerns whether the university

promised something that it failed to deliver.  Defendants' argument that this Court should abstain

from interfering in the type of allegations made by plaintiff in the complaint is unpersuasive.

### B.  CONTRACT CLAIMS REGARDING TUITION AND FEES

Defendants next argue that plaintiff failed to state actionable contract claims.  Defendants

first argue that Counts I and III, with respect to tuition and fees, fail to state a claim because this

state's jurisprudence rejects the notion that enrollment at a university creates an express or implied

contract between the university and a student.  In support of their position, defendants cite

unpublished (and non-binding) Court of Appeals decisions, as well as *Cuddihy v Wayne State

Univ*, 163 Mich App 153; 413 NW2d 692 (1987).  In *Cuddihy*, the Court of Appeals held that the

payment of fees did not entitle a student to graduate, nor could there be an enforceable promise in

an academic advisor's statement that the plaintiff in that case could "graduate soon," regardless of

whether she maintained her grades and passed her examinations.  *Id*. at 157-158.

The Court agrees with plaintiff in the instant case that *Cuddihy* and the rest of defendants' cases are unpersuasive, and it is unconvinced by defendants' assertions that no contracts can exist between universities and their students.   Unlike in *Cuddihy*, plaintiff in the instant matter is not alleging the right to graduate or to continue in her studies.   Rather, she alleges that she was promised a certain form of instruction and the benefit of certain fees, but that WMU failed to uphold its end of the bargain.   Borrowing from the opinion and order in *Milanov* once again, the Court agrees that "it is a bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent . . . a contract in violation of law or public policy."   *Corwin v DaimlerChrysler Ins Co*, 296 Mich App 242, 256; 819 NW2d 68 (2012) (citation and quotation marks omitted; cleaned up).   See also *Milanov*, opinion and order of the Court of Claims, pp. 8-9.   Plaintiff alleges that there were express contracts making the promises contained in the complaint, and that defendants breached those agreements. Based on these allegations, she has properly alleged contract claims that can be enforced by the Court, and at this stage of the litigation, summary disposition is not warranted on these claims.

## C.  ACADEMIC FREEDOM AND AUTONOMY

Defendants next argue that any claims related to tuition refunds must fail for the reason that plaintiff asks the Court to interfere with WMU's academic autonomy.   Citing *Regents of Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507; 88 L Ed 2d 523 (1985), defendants argue that the First Amendment protects certain essential freedoms for universities, including the freedom to determine how courses are to be taught.   According to defendants, any dispute regarding the decision to move classes online in the Spring 2020 semester is non-justiciable, because the Court cannot challenge WMU's academic decisions.

The Court disagrees that plaintiff's complaint asks the Court to interfere with WMU's academic autonomy, or that the First Amendment concerns cited in *Ewing* are implicated here. In *Ewing*, the plaintiff was dismissed from the University of Michigan after failing a written examination. *Ewing*, 474 US at 215. The issue in that case was whether the University of Michigan deprived the plaintiff of due process of law because it departed from past practice when it denied him the opportunity to retake the exam. *Id*. The Supreme Court of the United States cautioned that it had a responsibility to safeguard the academic freedom—which it remarked was a "special concern of the First Amendment"—of universities and educational institutions. *Id*. at 226 (citation and quotation marks omitted). And, the Court held that it was not suited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions . . . ." *Id*. Here, in contrast to *Ewing*, however, plaintiff is not asking the Court to interfere with or evaluate the substance of an educational decision. Instead, she is alleging that she was promised one form of instruction, and that she had an express contractual[1] agreement for the same, but that WMU switched the method of instruction without providing a refund. As did the Court in *Milanov*, the Court concludes that *Ewing* is inapposite and that defendants' arguments predicated on that case are not persuasive. The Court declines to extend *Ewing* to contract express contract claims.

## D.  PLAINTIFF'S PLEADINGS

Next, defendants urge the Court to dismiss because plaintiff failed to attach the alleged contracts to her complaint. In addition, defendants argue that plaintiff's complaint failed to plead

---

[1] Again, on review under MCR 2.116(C)(8), the Court accepts as true plaintiff's allegation that an express contract existed and that the contract is in defendants' possession, as alleged in the complaint and as permitted by MCR 2.113(C)(1)(b).

the fundamental elements of a contract, such as formation, whether promises were made in writing, which specific promises were made, and how those promises were made. Defendants' arguments are meritless. MCR 2.113(C)(1) provides that, when a claim is based on a written instrument, such as plaintiff's breach of contract claims, a copy of the instrument or its pertinent parts "must be attached to the pleading . . . ." However, the requirement to attach the instrument is excused if the instrument is "in the possession of the adverse party and the pleading so states." MCR 2.113(C)(1)(b). Here, plaintiff's complaint expressly states that the alleged contracts are in defendants' possession and she alleges specific promises that suffice to state a claim. Thus, her complaint has—albeit without much room to spare—satisfied the Court Rule, and defendants' assertions about plaintiff's failure to attach the documents are not fatal to the contract claims under MCR 2.116(C)(8) review. If the alleged agreements do not exist, and defendants have produced evidence to support their assertions, then they can make the appropriate motion under the appropriate Court Rule. However, for purposes of MCR 2.116(C)(8) review, and accepting the facts alleged as true as it is required to do, the Court rejects defendants' contentions about the adequacy of plaintiff's pleadings.

## E.  THE "HOUSING CONTRACT"

With respect to plaintiff's contentions about a contractual agreement for room and board, defendants have taken a different approach. As it concerns Count II, which alleges a breach of contract for room and board, defendants attach to their briefing as Exhibit F a "Housing Contract." This agreement, which is referenced in plaintiff's complaint, may be considered by the Court at this stage of the litigation. See MCR 2.113(C)(2); *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 635; 734 NW2d 217 (2007). Defendants argue that the "Housing Contract" is not a traditional contract, but instead is a set of rules with which plaintiff must comply in order to

remain eligible for university housing.   Defendants note that the Housing Contract reserves to WMU the right to remove students from on-campus housing if doing so is deemed to be in the best interests of WMU or its students.   In addition, they note that the Housing Contract gave WMU the right to amend or modify the agreement when "activities endanger" the health, welfare, or safety of students.   However, as plaintiff points out, the Housing Contract also provides that, in the event a public emergency or "other unforeseen occurrences beyond the control of" WMU prevent a student from using housing facilities, "this Contract for housing shall immediately terminate and You shall be responsible for charges *prorated to date of termination*."   (Emphasis added). Paragraph 67 of the complaint alleges that plaintiff was "not provided housing for the entire semester" due to the COVID-19 pandemic.   She also alleges that defendant gave a "directive" for students to move out of residence halls.   In sum, plaintiff has alleged facts that, if true, would support her claim for a prorated refund of prepaid room and board charges.   She has also alleged that that which was offered to her was inadequate.   Thus, at this stage of the proceedings, defendants have not presented a reason for this Court to dismiss Count II.

Furthermore, the Court finds defendants' renewed citation to *Sprik* inapplicable here as well.   The question presented in this case is not a challenge to the propriety of defendants' decision to modify the Housing Contract or to limit on-campus housing.   Rather, as alleged in the complaint, this case is concerned with plaintiff's assertion that a refund was owed under the terms of the parties' agreement.   Defendants cannot, by citing the autonomy of the university under authorities such as *Sprik*, escape alleged contractual liability.

## F.  ACCORD AND SATISFACTION

Next, the Court disagrees that defendants are entitled to summary disposition on Counts II and V—which pertain to room and board—because of the doctrine of accord and satisfaction.

Defendants note that plaintiff was offered, and that she accepted, $1,000 as a refund after she moved out of on-campus housing.  Accord and satisfaction is an affirmative defense to a breach of contract claim.  *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 70; 711 NW2d 340 (2006).  "An accord is a contract that requires a meeting of the minds of those who enter into it." *Id*.  A satisfaction "is the discharge of the debt occurring after acceptance of the accord."  *Id*. 71. In order to prove the existence of an accord and satisfaction:

> a defendant must show (1) its good-faith dispute of (2) an unliquidated claim of the plaintiff, (3) its conditional tender of money in satisfaction of the claim, and (4) the plaintiff's acceptance of the tender (5) while fully informed of the condition.  A defendant need not show a plaintiff's express acceptance of the condition; rather, the law of accord and satisfaction is that where a creditor accepts a conditional tender, the creditor also agrees to the condition.  However, the expression of the condition must be clear, full, and explicit.  [*Faith Reformed Church of Traverse City, Mich v Thompson*, 248 Mich App 487, 492; 639 NW2d 831 (2001) (citations and quotation marks omitted).]

At this stage of the proceedings, the Court agrees that there is a lack of an explicit and clear condition indicating that, if the money offered to plaintiff was accepted, it would discharge her entire claim.  Indeed, the pleadings do not contain sufficient details on this matter to allow the Court to reach the conclusion suggested by defendants, and no documentary evidence was submitted to suggest otherwise, much less could that documentary evidence even be considered on MCR 2.116(C)(8) review.  As a result, defendants' attempt to rely on this affirmative defense is unavailing at this state of the litigation.

## G.  UNJUST ENRICHMENT

Finally, defendants argue that plaintiff has failed to state actionable unjust enrichment claims.  Citing an unpublished Court of Appeals decision, defendants argue that there is no unjust enrichment when monies collected by a university are used for items in furtherance of the university's educational mission and/or functions of the university.  Defendants argue that plaintiff

has not, and cannot, identify funds that were used for non-university purposes, so her unjust enrichment claims must fail as a matter of law.

The primary authority on which defendants rely is *Moss v Wayne State Univ*, unpublished per curiam opinion of the Court of Appeals, issued December 1, 2009 (Docket No. 286034). In *Moss*, Wayne State University decided to increase tuition and to add a per-credit-hour contingency fee, given its uncertainty about receiving state funding. *Moss*, unpub op at 1. The contingency fee was only collected in the Fall 2007 semester, and the proceeds from the fees were used "to pay off a foundation loan, to add to a rainy-day fund, and for improvement of classrooms and technology, research and clinical trials, and student retention programs." *Id*. The plaintiffs in that case challenged the university's retention of the contingency fee funds despite the university's subsequent receipt of state funds. *Id*. In a single paragraph, the Court of Appeals panel held that the plaintiff's claims for unjust enrichment failed because he and other students "gained a general benefit" from the university's expenditures. *Id*. at 3. As a result, the university "was not the sole recipient of a benefit" and it was not inequitable for the university to retain the contingency fees. *Id*.

The Court begins by pointing out that the *Moss* decision is not binding under the rule of stare decisis. MCR 7.215(C)(1). Moreover, whatever persuasive value the decision might have is limited by its dissimilarities to the instant case. In contrast to the plaintiffs in *Moss*, plaintiff in the instant case alleges inequity resulting, not just from WMU's retention of the funds, but from WMU's retention of funds after providing students with less than what was expected. Notably, plaintiff alleges that she paid for but did not receive: a full semester of live, in-person instruction; on-campus housing; meal plans; and services. Accepting the allegations contained in the complaint as true—which this Court must do under MCR 2.116(C)(8)—plaintiff stated a claim for

-11-

unjust enrichment based on the claim that she paid for, and defendants retained, excess in comparison to what plaintiff received. See *Wright v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019). See also *Milanov*, opinion and order of the Court of Appeals, pp. 13-14.

III.     CONCLUSION

IT IS HEREBY ORDERED that defendants' motion for summary disposition is DENIED.

This is not a final order and it does not resolve the last pending claim or close the case.

September 15, 2020

Cynthia Diane Stephens
Judge, Court of Claims

-12-

**EXHIBIT 3**

# STATE OF MICHIGAN

# COURT OF CLAIMS

KLIMENT MILANOV, and TRENT INGELL,

        Plaintiffs,

v

UNIVERSITY OF MICHIGAN, and THE
REGENTS OF THE UNIVERSITY OF
MICHIGAN,

        Defendants.

___ ____ _____

**OPINION AND ORDER**

Case No.  20-000056-MK

Hon. Michael J. Kelly

 

        Pending before the Court is  defendants' motion for summary disposition filed pursuant to MCR 2.116(C)(8) and (C)(10).  For the reasons that follow, the motion is DENIED.  Given the comprehensive and informative briefing submitted by the parties, this matter will be decided without oral argument.  See LCR 2.119(A)(6).

##      I.      BACKGROUND AND PLAINTIFFS' COMPLAINT

        Plaintiffs in this putative class action are students at defendant university.  Their complaint arises out of actions defendants took in response to the onset of the COVID-19 pandemic.  Plaintiffs allege that defendants' actions deprived them of benefits for which they had already paid, including the benefit of in-person instruction, housing, meals, and student activities.  Plaintiffs seek refunds of the amounts they paid, on a pro-rata basis, for the remainder of the 2020 winter/spring semester.

Plaintiffs allege that, in approximately March 2020, defendant university announced that it would cancel all live, in-person instruction and would transition to online distance learning for the remainder of the semester.  In addition, defendants instructed students who lived in residence halls and on-campus housing to move out if they were able to do so.  Plaintiffs contend that nearly half of the semester remained at this time, yet defendants did not offer adequate refunds of tuition and fees for the services that were no longer available to students.  Plaintiffs note that defendants offered a $1,200 credit—which both plaintiffs accepted in this case—for students who followed the directive to move out of the residence halls by March 25, 2020.  However, plaintiffs contend that this credit is not commensurate with the financial losses they have suffered, nor is it equal to a prorated, unused amounts for room and board.  Plaintiffs allege that defendants failed to offer a refund for the difference in value between online distance learning and live, in-person instruction in a classroom setting.

Plaintiffs have now filed this putative class action in which they allege that the benefits and services for which they paid tuition and which they expected to receive were no longer available to them.  They allege that the online classes are not the equivalent of live, in-person instruction. In particular, plaintiff Kliment Milanov alleges that two of his classes were essentially cancelled because defendant university's online method of instruction failed to provide an adequate learning environment.  Plaintiffs assert that the decisions to transition to online classes and to encourage students to leave campus were "responsible" ones; nevertheless, they allege it is unlawful for defendants to retain the full tuition and fees paid by plaintiffs under the circumstances.

Plaintiffs filed a six-count complaint as a putative class action.  Count I alleges breach of contract on behalf of what plaintiffs contend is the "Tuition Class."  In this count, plaintiffs allege that they, and others like them, entered into contracts with defendant university in which they

agreed to pay tuition, in exchange for which defendant university would provide live, in-person instruction in a classroom setting. Despite plaintiffs paying the required amounts, plaintiffs allege that defendant university breached the agreement by providing online instruction for the second half of the winter semester. Plaintiffs allege that they have been deprived of the value of the method of instruction for which they paid tuition. They seek disgorgement of the difference between the value of half a semester of online learning versus the value of half a semester of live, in-person instruction.

Count II of the complaint alleges breach of contract with respect to what plaintiffs contend is the "Room and Board Class." Plaintiffs allege that they entered into contracts with defendant university wherein plaintiffs agreed to prepay funds for room and board. However, they allege that they were not provided room and board for the second half of the semester, and that defendants should provide a refund for the unused days of room and board.

Count III of the complaint alleges breach of contract by what plaintiffs have called the "Fee Class." This count alleges that plaintiffs paid certain fees to defendant university in exchange for services. However, defendant university retained the fees without providing to plaintiffs the benefit anticipated in the parties' agreement. Plaintiffs seek a refund in the form of disgorgement of the prorated, unused amounts of fees charged and collected.

Count IV of the complaint alleges, in the alternative to Count I, unjust enrichment with respect to the "Tuition Class" described in Count I. They allege that equity demands the return of the value of the difference between half a semester of online distance learning and the value of half a semester of live, in-person instruction. Plaintiffs allege defendant university has been

-3-

unjustly enriched by retaining monies paid by plaintiffs for live, in-person instruction without providing the services for which those funds were paid.

Count V is asserted in the alternative to Count II, and it is alleged with respect to the "Room and Board Class." Plaintiffs allege that defendant university received a benefit to which it was not entitled at the expense of plaintiffs who paid a full semester of room and board, but who received the benefit of only half a semester of room and board. Plaintiffs allege that equity demands the return of the prorated, unused amounts paid for room and board.

Count VI of the complaint is alleged by the "Fee Class" in the alternative to Count III. Plaintiffs assert that defendant university should return any monies paid for fees for the winter semester for services that plaintiffs were not provided. The retention of these funds is inequitable, allege plaintiffs.

## II.    DEFENDANTS' MOTION FOR SUMMARY DISPOSITION

This matter is now before the Court on defendants' motion for summary disposition filed pursuant to MCR 2.116(C)(8) and (C)(10). Defendants have raised a number of arguments in support of summary disposition, raising from assertions that this Court should abstain from reviewing educational matters, to failure to state a claim, and to contract defenses such as impossibility and/or commercial impracticability. The Court will review each of the arguments below.

Under MCR 2.116(C)(8), summary disposition is properly granted when "[t]he opposing party has failed to state a claim on which relief can be granted." A motion predicated on subrule (C)(8) tests the legal sufficiency of plaintiffs' claims based on the factual allegations contained in the complaint. *El-Khalil v Oakwood Hosp*, 504 Mich 152, 159; 934 NW2d 665 (2019). "When

considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. The Court may only grant the motion "when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.

As it concerns subrule (C)(10), summary disposition is warranted where, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). The moving party under subrule (C)(10) must identify specific issues and "must support its motion with affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted." *Barnard Mfg Co Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009), citing MCR 2.116(G)(3). "If the moving party properly supports its motion, the burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. at 370 (citation and quotation marks omitted).

### III.   ANALYSIS

### A. DEFENDANTS' CONTENTION THAT COURTS MUST ABSTAIN FROM REVIEWING EDUCATIONAL MATTERS IS WITHOUT MERIT HERE

Defendants first argue that, as it concerns plaintiffs' claims concerning the switch from live, in-person instruction to online distance learning must be dismissed because this Court should abstain from reviewing educational matters absent a clear violation of a student's due process rights. In support of this assertion, defendants cite the United States Supreme Court's decision in *Regents of the Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507; 88 L Ed 2d 523 (1985). However, the Court concludes that the case is inapposite to the issues presented in the matter at hand. In *Ewing*, the plaintiff was not permitted to retake an examination at defendant university, and he argued that defendant university's decision deprived him of property without due process of law.

-5-

*Id.* at 215.  Assuming that the plaintiff could assert a due process claim, the Supreme Court remarked that defendant university's decision regarding the plaintiff was an academic judgment. *Id.* at 225.  The Court explained that, "[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment."  *Id*.  Furthermore, the Court noted that it must remain cognizant of its responsibility to safeguard the academic freedom—"a special concern of the First Amendment"— in matters involving educational institutions.  *Id*. at 226 (citation omitted).  In that case, this "narrow avenue for judicial review" foreclosed any conclusion that defendant university's decision to dismiss the plaintiff rose to the level of a due process violation.  *Id*. at 227.

Returning to the instant case, the Court finds the citation to *Ewing* inapposite.  Plaintiffs are not asserting a due process violation or arguing that the University's decision to switch methods of instruction ran afoul of any constitutional rights.  Instead, they are arguing that the university promised one method of instruction, charged tuition and fees commensurate with that method of instruction, yet provided a different (allegedly lesser) method of instruction.  This is a claim potentially sounding in contract or in quasi-contract, not in due process.  The *Ewing* decision does not stand for the notion that *any* decision regarding academics is beyond review for a court.[1]  That is, while *Ewing* describes a number of areas into which a Court should be hesitant to intrude, principles of contract and quasi-contract are not among those areas.

---

[1] While the same is unnecessary for rendering a decision at this stage of the litigation, the Court notes troubling aspects of defendants' position.  For instance, adopting defendants' position could lead to the conclusion that the university could simply cancel all classes and then retain tuition and fees, having made the academic judgment that instruction was unnecessary or unwarranted.

-6-

B.  THE REGENTS' CONSTITUTIONAL AUTHORITY DOES NOT BAR PLAINTIFFS'
CLAIMS AS A MATTER OF LAW

Defendants next ask this Court to dismiss the entirety of plaintiffs' complaint because this

Court, or any court, lacks authority to interfere with defendant regents' decisions regarding

expenditures and operation of defendant university.   In essence, defendants ask the Court to

conclude that they are shielded by a type of immunity that leaves them impervious to nearly any

type of claim.  The Court disagrees, and finds the section of the Constitution and the caselaw cited

by defendants inapplicable to the matter at hand.

In making their argument, defendants cite Const 1963, art 8, § 5, which grants defendant

regents "general supervision of its institution and the control and direction of all expenditures from

the institution's funds."   Defendants also rely on caselaw interpreting this provision, and they

primarily cite the Court of Appeals' decision in *Sprik v Regents of Univ of Mich*, 43 Mich App

178; 204 NW2d 62 (1972).  In that case, students in "family housing units" for married students

at defendant university brought a class action against defendant regents.  The issue in that case

concerned an adjustment to lease agreements made between the regents and members of the class

concerning a rent increase; such a rent increase could, pursuant to the terms of the leases, be made

at the university's sole discretion upon the requisite notice being given.  *Id*. at 182.  The rent

increase in that case was paid to the Ann Arbor School District in lieu of property taxes.  *Id*.

While challenging the validity of the increase, the plaintiffs conceded that the terms of their

lease gave defendant regents the authority to raise their rent.  *Id*. at 185.  However, they argued

that their rent could only be raised for purposes connected with the housing provided to them, and

not in the manner done by defendant regents.  *Id*.  Citing art 8, § 5, the Court of Appeals held that

defendant regents had "the entire control and management of University affairs, including the

-7-

management of property and expenditure of funds, to the exclusion of all other departments of the State." *Id.* at 186.  Hence, the Court held that the funds in issue could be spent "for any object which is not subversive" of the university's purpose.  *Id.* at 187.  And in that case, payment of funds to support schools in the community in which the university was located promoted community relations and encouraged local education—both purposes that were squarely within constitutional bounds.  *Id.* at 188.

Returning to the matter at hand, the Court agrees with plaintiffs that defendants' citation to art 8, § 5 and to the holding in *Sprik* are not controlling in the case at bar.  The case at bar is distinguishable from *Sprik* because plaintiffs are not challenging an expenditure made by defendants.  Instead, they are arguing that defendants breached contractual agreements and/or unjustly retained a benefit by failing to provide plaintiffs the full benefit of their bargain. Defendants have failed to present a compelling argument as to why art 8, § 5's provisions about defendant regents' control over university expenditures would insulate them from claims sounding in contract or quasi-contract.

## C.   STUDENTS CAN, AND DO, ENTER INTO CONTRACTS WITH UNIVERSITIES

Defendants next argue that, assuming their constitutional and immunity arguments do not apply, plaintiffs' claims must be dismissed because this state's jurisprudence does not recognize the existence of a contract between universities and students.  To this end, they argue that courts have repeatedly held that student handbooks, codes, or other informational materials given to students do not create contracts between universities and students.

The Court disagrees and finds the authorities defendants cite inapposite.  The instant case is not one where plaintiffs are alleging that they had a contractual right to continued enrollment or

to graduation.  Cf. *Cuddihy v Wayne State Univ Bd of Governors*, 163 Mich App 153; 413 NW2d 692 (1987).  As plaintiffs point out, "[i]t is a bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent . . . a contract in violation of law or public policy." *Corwin v DaimlerChrysler Ins Co*, 296 Mich App 242, 256; 819 NW2d 68 (2012) (citation and quotation marks omitted).  Moreover, plaintiffs have attached to their responsive briefing a number of documents, such as housing contracts and meal plan contracts, between students and defendants.  These documents expressly state that they are, in fact, binding agreements between students and defendant university.  In short, if the law does not recognize contractual relationships between universities and students, this would appear to be news to defendants, based on the record before the Court.[2]  That is not to say that plaintiffs have established their breach of contract claims or the existence of the pertinent contracts in this case; rather, it is simply a rejection of defendants' legal argument that such agreements cannot exist.

## D.  DEFENDANTS' ARGUMENTS ABOUT THE ADEQUACY OF PLAINTIFFS' PLEADINGS ARE WITHOUT MERIT

Defendants next argue that summary disposition on plaintiffs' contract claims is warranted under MCR 2.116(C)(8) because plaintiffs failed to attach copies of pertinent agreements to their pleadings.  To this end, MCR 2.113(C)(1) provides that if a claim is based on a written instrument, "a copy of the instrument or its pertinent parts must be attached to the pleading[.]"  The rules provide exceptions for agreements that are "in the possession of the adverse party and the pleading

---

[2] This is particularly so in light of *Sprik*, a case in which the validity of lease agreements between the plaintiff students and defendant regents was conceded by all of the parties involved.

so states," and "inaccessible to the pleader and the pleading so states, giving the reason[.]" MCR

2.113(C)(1)(b)-(c). Here, the Court concludes that dismissal is unwarranted because, although the

pertinent agreements were not attached to the pleadings[3] it is apparent that the complaint repeatedly

references the alleged agreements as being defendants' agreements, i.e., that defendants possess

the purported agreements. In addition, plaintiffs have attached to their responsive briefing portions

of certain contractual agreements with defendants. Consequently, the Court declines to find that

summary disposition is warranted at this time.[4]

Defendants' remaining arguments regarding plaintiffs' pleadings fare no better.

Defendants argue that plaintiffs failed to state a claim on which relief can be granted because they:

(1) failed to plead the essential elements of a valid contract; and (2) failed to plead damages. A

contract claim requires a plaintiff to establish "that (1) there was a contract, (2) the other party

breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank

of America, NA v First American Title Ins Co*, 499 Mich 74, 100; 878 NW2d 816 (2016). A

contract is valid if the following elements exist: "(1) parties competent to contract, (2) a proper

subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of

obligation." *Id*. at 101 (citation and quotation marks omitted).

---

[3] In fact, it is not apparent that plaintiffs have identified an express contractual agreement establishing their right to live, in-person instruction. Should it become clear at some point in the future that such an agreement does not exist, it could be grounds for revisiting summary disposition on Count I of the complaint as it concerns an express contractual right to live, in-person instruction. However, the Court will not dismiss Count I at the current time, for the reason that the allegations contained within the complaint are sufficient to fulfill plaintiffs' pleading obligations.

[4] Furthermore, given plaintiffs' attachment of these documents to their responsive briefing, the Court would entertain plaintiffs' alternative request for leave to amend to attach the agreements even if it were inclined to grant summary disposition at this time.

Having reviewed Counts I-III of the complaint, the Court disagrees that these claims fail to plead the elements of a breach of contract cause of action. For instance, ¶ 65 of the complaint identifies the parties to the contract, the subject-matter (live, in-person instruction, room and board, and "fees"), the consideration provided by each side, and each side's obligations. Paragraph 67 expressly alleges a breach by defendant university, and ¶¶ 69-70 allege damages suffered by plaintiffs. Counts II and III are likewise adequately pled. See, e.g., Complaint, ¶¶ 74-78; 81-84. The aforementioned elements, including the element of damages—which is repeatedly mentioned throughout the complaint—are sufficient to satisfy this state's notice-pleading requirements. See *Dalley v Dykema Gossett*, 287 Mich App 296, 305; 788 NW2d 679 (2010) (citation and quotation marks omitted) (explaining that the "primary function of a pleading in Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position.").

## E. DEFENDANTS' REAL-PARTY-IN-INTEREST ARGUMENTS LACK MERIT

Defendants next ask the Court to dismiss because they contend plaintiffs' complaint fails to identify the real parties in interest. To this end, they note that the complaint refers to the proposed class as students, as well as those who paid tuition on behalf of students. "A real party in interest is one who is vested with the right of action on a given claim, although the beneficial interest may be in another." *In re Beatrice Rottenberg Living Trust*, 300 Mich App 339, 356; 833 NW2d 384 (2013). Here, the two named plaintiffs alleged in ¶¶ 9-20 that they paid certain tuition, costs, and fees for the winter 2020 semester pursuant to agreements with defendant, that they did not receive the benefits for which they paid, and that they suffered damages as a result. Given these allegations, it is apparent plaintiffs are the ones with a vested right of action on their alleged claims. See *id*. Defendants' real-party-in-interest defense is without merit as a result.

-11-

F.  THE ALTERNATIVE CLAIMS FOR UNJUST ENRICHMENT ARE PROPERLY
PLED

Defendants next argue that plaintiffs failed to plead claims for unjust enrichment such that

summary disposition is warranted on these claims pursuant to MCR 2.116(C)(8), and/or that

summary disposition is warranted on the unjust enrichment claims pursuant to MCR 2.116(C)(10).

The elements of an unjust enrichment claim are: "(1) receipt of a benefit by the defendant from

the plaintiff, and (2) which benefit it is inequitable that the defendant retain." *Meisner Law Group*

*PC v Weston Downs Condos Ass'n*, 321 Mich App 702, 721; 909 NW2d 890 (2017).  "Not all

enrichment is unjust in nature, and the key to determining whether enrichment is unjust is

determining whether a party unjustly received and retained an independent benefit." *Karaus v*

*Bank of New York Mellon*, 300 Mich App 9, 23; 831 NW2d 897 (2012).  Unjust enrichment

"describes the result or effect of a failure to make restitution of or for property or benefits received

under such circumstances as to give rise to a legal or equitable obligation to account therefor." *Id*.

(citation and quotation marks omitted).  In general, the question of whether one has been unjustly

enriched is a question of fact.  *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193;

729 NW2d 898 (2006).

Here, defendants ask the Court to dismiss the unjust enrichment claims because they

contend plaintiffs failed to allege that the monies collected by defendant university were used for

anything other than legitimate purposes.  Hence, the retention of the benefits was not inequitable,

argue defendants.  In support, defendants cite an unpublished Court of Appeals decision, *Moss v*

*Wayne State Univ*, unpublished per curiam opinion of the Court of Appeals, issued December 1,

2009 (Docket No. 286034).  In that case, Wayne State University (WSU) faced uncertainty about

certain state funding, so it increased tuition by 12.8% and added a per-credit-hour contingency fee.

*Moss*, unpub op at 1.  The contingency fee was eliminated for the winter semester after the

-12-

uncertainty over receiving state funds was resolved. *Id*. The already-collected fees were used "to pay off a foundation loan, to add to a rainy-day fund, and for improvement of classrooms and technology, research and clinical trials, and student retention programs." *Id*. The Court of Appeals panel remarked that the contingency fees collected by WSU in that case were used for "programs and projects to further the educational goals of the mission." *Id*. at 3. Thus, the plaintiffs and other students in that case gained a benefit from the funds—because they were put to uses that benefited the students—such that WSU was not the sole recipient of a benefit in that case. *Id*. As a result, it was not inequitable for WSU to retain the contingency fees in that case. *Id*.

The Court is unmoved by the nonbinding decision in *Moss*, see MCR 7.215(C)(1) (declaring that an unpublished decision from the Court of Appeals is not binding under the rule of stare decisis), and concludes that: (1) plaintiffs' complaint adequately pleads causes of action for unjust enrichment; and (2) the current documentary evidence does not support the request for summary disposition under subrule (C)(10). Here, the allegations by plaintiffs are that defendants did not provide the full extent of the services that were secured by plaintiffs' payment of amounts for tuition, fees, and room and board. While plaintiffs might have received a benefit from attending classes in an online environment, the case is distinguishable from the nonbinding *Moss* decision because plaintiffs allege that they received a lesser education than that which they stood to receive from live, in-person instruction. Indeed, "[r]estitution restores a party who yielded excessive and unjust benefits to his or her rightful position." *Wright v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019). Here plaintiffs have alleged that they yielded excess in comparison to what they received. Defendants' documentary evidence has not negated this element of plaintiffs' claim. Furthermore—and as it concerns the room-and-board claim—defendants have not presented evidence in support of their brief, one-sentence argument that their retention of excess

-13-

amounts paid for room and board provided a benefit to plaintiffs.  See *Barnard*, 285 Mich App at 370 ("If the moving party fails to properly support its motion for summary disposition, the nonmoving party has no duty to respond and the trial court should deny the motion.").  Thus, summary disposition is not warranted on this basis.

## G.  DEFENDANTS' DEFENSES TO PLAINTIFFS' CONTRACT THEORIES DO NOT WARRANT SUMMARY DISPOSITION

As an alternative to the arguments set forth above, defendants assert the affirmative defense of supervening impossibility and/or impracticability to plaintiffs' breach of contract claims.  "A promisor's liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform." *Roberts v Farmers Ins Exchange*, 275 Mich App 58, 73; 737 NW2d 332 (2007).  A party asserting this affirmative defense need not show "absolute impossibility"; instead, the party must demonstrate "impracticability because of extreme and unreasonable difficult, expense, injury or loss involved."  *Id*. at 74 (citation and quotation marks omitted).  Here, defendants argue that the COVID-19 pandemic and Governor Whitmer's Executive Orders rendered live, in-person instruction and the provision of room and board impossible and/or impracticable.

In response to defendants' arguments, plaintiffs argue that they are not contesting whether defendants could provide the contracted-for services.  Instead, they argue that they should be entitled to a refund of the services, for which plaintiffs pre-paid, that defendant university stopped providing in light of the pandemic.  As plaintiffs point out, caselaw holds that, even when performance has become impossible, a party who was deprived of the promised performance is entitled to a refund of consideration for services not rendered due to impossibility. *Vowels v Arthur Murray Studios of Mich, Inc*, 12 Mich App 359, 363; 163 NW2d 35 (1968).  Defendants have not

-14-

articulated a compelling argument as to why impossibility or impracticability would be a valid defense to this type of refund claim.  As a result, summary disposition is not appropriate based on defendants' stated affirmative defenses.

### H.  DEFENDANTS' ARGUMENT BASED ON ACCORD AND SATISFACTION DOES NOT WARRANT SUMMARY DISPOSITION IN THEIR FAVOR

Defendants next argue that they are entitled to summary disposition on Counts II and V of the complaint with respect to amounts paid by plaintiffs for room and board because of the doctrine of accord and satisfaction.  According to defendants, the $1,200 refund bars plaintiffs from pursuing this action.  Further, they argue that the "tender-back" rule required plaintiffs to return the $1,200 prior to filing suit, which they have not done.

The doctrine of accord and satisfaction is an affirmative defense to a contract claim.  *Faith Reformed Church of Traverse City, Mich v Thompson*, 248 Mich App 487, 491; 639 NW2d 831 (2001).  "An 'accord' is an agreement between parties to give and accept, in settlement of a claim or previous agreement, something other than that which is claimed to be due, and 'satisfaction' is the performance or execution of the new agreement."  *Id*. at 491-492.  A defendant asserting accord and satisfaction, must demonstrate:

> (1) its good-faith dispute of (2) an unliquidated claim of the plaintiff, (3) its conditional tender of money in satisfaction of the claim, and (4) the plaintiff's acceptance of the tender (5) while fully informed of the condition.  A defendant need not show a plaintiff's express acceptance of the condition; rather, the law of accord and satisfaction is that where a creditor accepts a conditional tender, the creditor also agrees to the condition.  However, the expression of the condition must be clear, full, and explicit.  [*Id*. at 492 (internal citations and quotation marks omitted).]

On the evidence before the Court, defendants are not entitled to summary disposition on their accord and satisfaction claim.  Firstly, defendants have produced no evidence of a

communication of a good-faith dispute of any claims by plaintiffs. Indeed, it appears from the only documentary evidence before the Court that $1,200 was simply offered to students who moved out of university-owned housing. Furthermore, and more significantly, the record lacks a "clear, full, and explicit" expression that the refund was offered in full and final resolution of any claims plaintiffs might have against defendant. Cf. *Faith Reformed Church*, 248 Mich App at 493-494. The only documentary evidence regarding the $1,200 credit to student accounts states that the refund was being "offered" to students who moved out of university housing by March 25. The record is void of documentary evidence indicating that, by moving out and by accepting the $1,200, students were agreeing to a full and final resolution of any claims they might have against defendants with respect to prepaid amounts for room and board. Thus, the record lacks evidence of the "accord" part of an accord-and-satisfaction defense, and summary disposition under subrule (C)(10) is not warranted on this record. See *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 71; 711 NW2d 340 (2006) (describing the operation of the accord-and-satisfaction doctrine).

## I. DEFENDANTS' ARGUMENTS REGARDING PLAINTIFF INGELL

Defendants next argue that they are entitled to summary disposition on plaintiff Ingell's claims for the reason that he did not pay tuition or fees during the winter 2020 semester; instead, his tuition and fees for the semester were covered by scholarships and grants. At the outset, any scholarships or grants awarded to plaintiff Ingell cannot bar his claims for room and board reimbursement. Indeed, defendants' own documentary evidence, at ¶ 9 of Vicky Crupper's affidavit, reveals that plaintiff Ingell used federal student loan money, i.e., non-scholarship funds, to pay at least part of his room and board expenses for the winter semester. In addition, the documentary evidence defendants provide does not convince the Court that plaintiff Ingell would be unable to plead and prove damages. Notably, while the documentary evidence shows that

plaintiff Ingell's tuition was paid by scholarship and grant monies during the 2020 winter semester, the evidence does not answer the question of whether the particular use of scholarship and grant money at that time was to the detriment of the future use of scholarship and grant money. In other words, the evidence does not speak to whether there is a finite source of scholarship and grant money, nor does it inform whether the use of the money in the winter 2020 semester could potentially reduce any amounts plaintiff Ingell could use at a later date. Additionally, caselaw provides that nominal damages will sustain a cause of action, meaning that, even if plaintiff Ingell did not sustain actual damages, he can still maintain an action upon showing a violation of rights by way of a breach of contractual promise to provide live, in-person instruction. See *4041-49 W Maple Condo Ass'n v Countrywide Home Loans, Inc*, 282 Mich App 452, 460; 768 NW2d 88 (2009).

## IV.    CONCLUSION

IT IS HEREBY ORDERED that defendants' motion for summary disposition is DENIED.

This is not a final order and it does not resolve the last pending claim or close the case.

July 27, 2020

_____
Michael J. Kelly
Judge, Court of Claims

-17-

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10844-RGS

MANNY CHONG, THANE GALLO, and
ALL OTHERS SIMILARLY SITUATED,

v.

NORTHEASTERN UNIVERSITY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

December 14, 2020

STEARNS, D.J.

Manny Chong and Thane Gallo filed this putative class action against Northeastern University. By way of a Third Amended Complaint (TAC) (Dkt # 40), they allege that Northeastern breached a contract with its students (Counts I, III, and V) or, alternatively, unjustly enriched itself at its students' expense (Counts II, IV, and VI) when it retained the full amount of tuition and fees collected for the Spring semester of 2020, despite ceasing in-person instruction and closing its on-campus facilities and resources. Northeastern moves to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the court will __ALLOW__ the motion in part and __DENY__ it in part.

## BACKGROUND

The essential facts, drawn from the TAC and documents incorporated by reference, and viewed in the light most favorable to the plaintiffs as the nonmoving parties, are as follows.  Northeastern is a private educational institution with a main campus in Boston, Massachusetts.  Gallo is an undergraduate student who enrolled in courses at Northeastern during the Spring semester of 2020.  Chong is a graduate student who enrolled in courses at Northeastern during the Spring semester of 2020.

Before the semester began, Gallo and Chong (and all similarly situated students) executed an Annual Financial Responsibility Agreement (FRA) with the University.  Insofar as relevant here, the agreement provides:

> In exchange for the opportunity to enroll at Northeastern, to receive educational services, and for other valuable consideration, I agree to the following terms and conditions:
>
> . . .
>
> PAYMENT OF FEES/PROMISE TO PAY
>
> By registering for any class or receiving any service from Northeastern, I accept full responsibility to pay all tuition, fees and other associated costs assessed as a result of my registration and/or receipt of services. I understand and agree that my registration and acceptance of these terms constitutes a promissory note agreement . . . in which Northeastern is providing me educational services, deferring some or all of my payment obligation for those services, and I promise to pay for all assessed tuition, fees and other associated costs by the published or assigned due date.

2

Ex. A to TAC; Ex. B to TAC.  The FRA does not explicitly define the term "educational services."  Plaintiffs allege, however, that Northeastern described the "educational services" each student could expect to receive in "numerous statements, promises, and representations in the Semester Schedule and Class Details documents" that Northeastern issued during student registration.  TAC ¶ 18.

After signing the FRA, plaintiffs registered for courses designated in Class Detail documents as having "traditional" instruction (i.e., face-to-face instruction in a classroom setting), *id.* ¶¶ 30-31, and Northeastern issued Semester Schedules specifying that instruction for their courses would occur "within an assigned room in specific buildings — Ryder Hall (as to . . . Chong), and Kariotis Hall, Hurtig Hall, Richards Hall, and Behrakis Center (as to . . . Gallo) — on Northeastern's Boston campus," *id.* ¶ 23.

For the first half of the Spring semester, instruction for plaintiffs' courses occurred in person, as specified in the Semester Schedule and Class Details documents.  On March 11, 2020, however, the University's president notified students that "all Spring 2020 courses offered by Northeastern would be taught online beginning March 12, 2020 for the remainder of the semester, in response to the spread of the Covid-19 virus."  *Id.* ¶ 45.  Northeastern also closed its on-campus facilities, including its classrooms,

laboratories, library, student center, fitness centers, and the First Year Learning & Innovation Center workspaces, effective March 12, 2020. No tuition-paying student had access to in-person instruction or on-campus facilities and resources during the remainder of the Spring semester of 2020. Chong further alleges that one of his professors ceased offering lectures to students following the switch to remote learning and instead emailed weekly notes, reducing the hands-on instruction time in the course to zero until the end of the semester.

Chong petitioned for a partial refund of the tuition and fees he had paid to Northeastern for the Spring semester of 2020, citing the pedagogical inferiority of online instruction. When Northeastern failed to act on his petition or otherwise offer its students a refund, he and Gallo filed the instant putative class action. They assert six claims on behalf of three nominated classes: breach of contract (Count I) or, alternatively, unjust enrichment (Count II) as to a Tuition Class, tentatively defined as "[a]ll Northeastern University students who attended one or more courses in-person for credit on a Northeastern campus between January 1, 2020 and March 11, 2020 . . . and paid tuition monies to Northeastern" for these courses; breach of contract (Count III) or, alternatively, unjust enrichment (Count IV) as to an Undergraduate Fees Class, tentatively defined as "[a]ll Northeastern

4

University undergraduate students who paid Northeastern a student activity fee, an undergraduate student fee, a campus recreation fee, and a student center fee on or before March 11, 2020, and who registered for one or more Spring 2020 courses for credit on a Northeastern campus March 11, 2020"; and breach of contract (Count V) or, alternatively, unjust enrichment (Count VI) as to a Graduate Fees Class, tentatively defined as "[a]ll Northeastern University graduate students who paid Northeastern a student activity fee, a recreation fee, and a student center fee on or before March 11, 2020, who registered for one or more Spring 2020 courses for credit on a Northeastern campus before March 11, 2020." *Id.* ¶¶ 59, 64, 66.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its

factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

### a. Count I, breach of contract as to the Tuition Class

Count I asserts a claim for breach of contract relative to the payment of tuition for the Spring semester of 2020.[1]  "Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013), citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961).

Northeastern argues that plaintiffs have failed to state a claim for breach of contract because they have not sufficiently identified the basis for any contractual right to in-person instruction.  Plaintiffs respond that the contractual right to in-person instruction derives from two sources: the FRA

---

[1] The court is not convinced that plaintiffs' contract claim is merely a disguised educational malpractice claim, as Northeastern implies.  The TAC appears to challenge the mere fact of the switch from in-person to online instruction, not the *quality* of the online education Northeastern provided. *See Salerno v. Fla. S. Coll.*, 2020 WL 5583522, at *5 (M.D. Fla. Sept. 16, 2020).  And while it is possible that the measure of damages for this alleged breach will so inextricably implicate the issue of quality as to render the claim non-actionable, the court needs more information before it can make an informed assessment.

6

and the course registration materials.[2]  Specifically, they cite to statements in the FRA tying the payment of tuition to registration and the receipt of "educational services" and statements in plaintiffs' Semester Schedule and Class Detail documents indicating that the "educational services" they had contracted to receive for the semester would include "traditional," face-to-face instruction in physical locations on campus.[3]  Drawing all inferences in plaintiffs' favor, the court cannot, as a matter of law, say that no student who read these statements could have reasonably expected that executing the FRA and registering for on campus courses would entitle them to in-person instruction.  *See Bleiler v. Coll. of Holy Cross*, 2013 WL 4714340, at *15 (D.

---

[2] Northeastern maintains that the FRA and the course registration materials cannot reasonably be read together.  The court declines to resolve the issue at this juncture.  Plaintiffs allege that the documents are intertwined and form a larger educational services agreement, and these allegations are at least plausible given repeated references to the registration process in the FRA and the fact that, as a matter of common sense, students presumably would not incur any obligation to pay for "educational services" unless they registered for classes.  The court accordingly reserves for a future (post-discovery) stage the determination of whether the overarching educational services agreement pled by plaintiffs does, in fact, exist.

[3] Northeastern disputes the allegation that a student could reasonably expect the statements, promises, and representations in their Semester Schedule and Class Detail documents to guarantee the nature of the "educational services" that he or she would receive under the FRA.  For the reasons discussed in footnote 2, however, the court declines to resolve the issue as a matter of law at this juncture.  Plaintiffs' allegation is at least plausible, so it would be inappropriate to dismiss the claim prior to discovery.

Mass. Aug. 26, 2013) ("When interpreting contracts between students and their academic institutions, under Massachusetts law courts employ the standard of reasonable expectation — what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." (internal quotation marks omitted)), quoting *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000). Further factual development is needed to resolve the issue on the merits.[4] The court accordingly denies the motion to dismiss Count I.

### b. Counts III and V, breach of contract as to the Undergraduate Fees Class and the Graduate Fees Class

Counts III and V assert breach of contract claims relative to the payment of certain student fees. Plaintiffs allege that Northeastern breached its obligations under the educational services agreement "when it ceased permitting access to any Northeastern student to its campus facilities, including its student center, with no on-campus activities conducted in any of those facilities, upon information and belief, from late March 2020 onward." TAC ¶ 110.

---

[4] Other documents unavailable to the court at the motion to dismiss stage, for example, may undercut the reasonableness of any expectation of in-person instruction.

Plaintiffs do not point to any explicit language in the FRA or the registration materials creating an entitlement to access on-campus facilities and resources. Because the FRA ties the payment of fees to the receipt of services, however, the educational services agreement may implicitly create such a right. The court accordingly turns to the payment terms and description of the services received for each fee. Northeastern states that it assesses the campus recreation fee "during terms a student is in classes to support and maintain current facilities and the future construction of athletic fields and facilities," and to give students "the option to gain admission to home athletic events, use the Marino Fitness Center, the SquashBusters athletic facility, and the Cabot Gym (fitness and pool)." *Fee Descriptions*, Ne. Univ. Student Fin. Servs., https://studentfinance.northeastern.edu/billing-payments/tuition-and-fees/fee-descriptions/ (last visited December 4, 2020); *see also* TAC ¶ 62. It further states that it assesses the student activity fee annually to "provide[] support for student organizations, clubs and entertainment events throughout the school year." *Id.* The student center fee is described as a payment "per in-school term to support the Curry Student Center." *Id.* Finally, Northeastern purports to assess the undergraduate student fee per "in-class or study abroad term" to "support[] enrollment related services

9

throughout the student's first year, including new student orientation and welcome week activities," and to "support[] subsequent enrollment services and . . . costs related to ongoing communication to students and parents." *Id.*

Because students pay the student activity fee, the student center fee, and the undergraduate student fee to "support" certain facilities during terms for which those students are enrolled in classes,[5] and not to gain admission to any on-campus facility or access to a given resource (or even to support the operation of any specific service at an on-campus facility), plaintiffs have not stated a claim for breach of contract with respect to these fees. The court accordingly allows the motion to dismiss Counts III and V to the extent these claims are premised on payment of the student activity fee, the student center fee, or the undergraduate student fee.

Students also pay the campus recreation fee to "support" certain facilities. Payment of the campus recreation fee, however, gives students "the option to gain admission to home athletic events" and to "use the Marino

---

[5] The fee descriptions refer generally to annual payments or payments per in-class term. Because the fees are assessed on a per year or per term basis (i.e., not daily), and because plaintiffs presumably were still classified as in-class students for the Spring semester of 2020, even after the switch to remote learning, the court declines to find that they had no obligation to pay these fees after March 12, 2020.

10

Fitness Center, the SquashBusters athletic facility, and the Cabot Gym (fitness and pool)." Because plaintiffs allege that they lost the option to attend home athletic games or use fitness facilities after March 12, 2020,[6] plaintiffs have stated a plausible claim for breach of contract with respect to the campus recreation fee. The court accordingly denies the motion to dismiss Counts III and V to the extent these claims are premised on payment of the campus recreation fee.

### c. Counts II, IV, and VI, unjust enrichment as to all classes

Counts II, IV, and VI assert claims of unjust enrichment. To assert a claim for unjust enrichment, a plaintiff must show (1) "she conferred a benefit upon the defendant," (2) "the defendant accepted the benefit," and (3) "the defendant's retention of the benefit would be inequitable without payment for its value." *Reed v. Zipcar, Inc.*, 883 F. Supp. 2d 329, 334 (D. Mass. 2012), *aff'd*, 527 F. App'x 20 (1st Cir. 2013).

Northeastern argues that plaintiffs cannot, as a matter of law, state a claim for unjust enrichment because they have an adequate alternative

---

[6] Northeastern contends that it could not have breached any obligation to give students the "option" to attend home athletic games because there were no home athletic games held on campus after March 12, 2020. But this argument implicates a factual issue (whether cancelling all home athletic events deprived students of the *option* to attend home athletic games) and is therefore inappropriate for resolution at the motion to dismiss stage.

11

remedy available, namely, a breach of contract action.  *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) (noting that "a party with an adequate remedy at law cannot claim unjust enrichment").  But unlike the Second Amended Complaint, the TAC does not rely on the existence of a single document that indisputably governs the parties' contractual relationship.  It alleges a broader educational services agreement entitling students to in-person instruction.  As Northeastern disputes the existence of any binding contract, and as plaintiffs plead unjust enrichment only to the extent the parties do not have a valid contract, it would be inappropriate for the court to find plaintiffs limited to a contractual remedy at this early stage of the litigation.  *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140-141 (1st Cir. 2012).  The court accordingly declines to dismiss these counts.[7]

## ORDER

For the foregoing reasons, the motion to dismiss is <u>ALLOWED</u> as to the portions of Counts III, IV, V, and VI premised on payment of any student activity fee, student center fee, or undergraduate student fee.  It is <u>DENIED</u> in all other respects.  Counts I and II and the portions of Counts III, IV, V,

---

[7] The court notes, however, that the unjust enrichment claims only survive to the extent the contract claims survive.  It thus dismisses the portions of Counts IV and VI premised on payment of a student activity fee, student center fee, or undergraduate student fee.

and VI premised on payment of a campus recreation fee also survive
Northeastern's motion.


SO ORDERED.

Richard G. Stearns
UNITED STATES DISTRICT JUDGE

13